Mr. Greenberg, I understand you will be taking the first six minutes. Mr. Krent, nine. Thank you. Good morning, Your Honors. This is a case where there was no physical evidence. No one ever saw Drew Peterson go to the site and commit this murder. No one could explain when exactly it took place. No one could really explain how exactly it took place. And what happened in this case is that Drew Peterson, unfortunately, went out very early on and hired a conflicted lawyer. He hired a lawyer who went out and had him sign a media rights contract. The media rights contract is prohibited under our rules of professional responsibility. And that immediate push governed everything in the case. It was how the case was handled where you went on TV and you talked about things. And those things were then used against you at trial, played by the prosecution. It was where you tried to make money for the case, which is prohibited. So the lead attorney on the case was operating under a conflict of interest. And all of our other issues sort of flow from, almost all of our other issues, flow from that. And when I say it was a conflict of interest, there's some discussion in the briefs about what kind of a conflict of interest it was. It's clearly a per se conflict. The Illinois or New York Bar has the same rules that we have. And the rules on literary rights, which are the media rights, come from the ABA rules, the model rules of the ABA. And in New York, they've got a commentary for that that's put out by the New York Bar. And that commentary says, a lawyer in a criminal case who obtains from the client television, radio, motion picture, newspaper, magazine, book, or other literary or media rights, which is exactly what happened here, with respect to the case may be influenced, consciously or unconsciously, to a course of conduct that will enhance the value of the literary or media rights to the prejudice of the client. And that's what happened here. We had a course of conduct that went on in this case that was just mind-boggling, from appearing on TV stations and talking about the crime, which was played at trial and used against them, to ultimately culminating with the calling of Harry Smith at trial. But didn't your client have other counsel as well? He did have other counsel. No one else was aware of the media rights contract. That contract was Mr. Brodsky, Mr. Peterson, and the PR person. It was done long before any of the other attorneys became involved in the case. So no one else was aware of it. And frankly, I know this is an argument that the state has made in relation to the ineffective assistance, that there were six attorneys with all this experience. There is no case that says that because you have more than one attorney or five attorneys or ten attorneys, that something can't be ineffective. It is the decision that is the focus of whether or not something is ineffective. Well, let's go with this pre-trial publicity. So how, in your mind, let's assume he's got a conflicted lawyer, and they do this publicity right. How are you going to cure that? It should have come in at trial. Okay, but it did. So what do we do about it? What do the courts do about that? Well, it's a per se conflict. Okay, I get it. And then what? You get a new trial. If you get a new trial, what's to stop the prosecution from playing that stuff that happened before? Well, because it shouldn't have been. And if your attorney that's giving you advice is conflicted, the prosecution should not be able to use that evidence against you at a trial. Well, the prosecution didn't hire that lawyer, and are you saying if a guy hires a lawyer, you go out and commit a crime, you hire a lawyer and say, let's do media rights, and then you go on TV and say, you know what? I did it. I confessed, and here's how I did it. And then they say, oh, you've got a conflicted lawyer, and so we're going to give you a new trial, and then it's a new trial. They can't use that confession? Well, they shouldn't be able to, and the reason is because the lawyer shouldn't have done the media thing in the first place. That's why the lawyer exists. Who hired the lawyer? The client. Who hired the lawyer? Of course. In fact, Mr. Peterson hired the lawyer because he was on TV himself. I can see that saying, I need a lawyer. But when the lawyer comes in, you know, there's the old saying that he who doesn't talk walks. There's reason they're saying it. There's reasons why you don't get cases where criminal defense lawyers go in and have their clients talk about the crime. You have to look at the motivation, and the reason it's a per se conflict, because it's a per se conflict, we don't have to show prejudice. So the first issue is we should get a new trial. And you haven't shown prejudice at all, have you? Prosecution used it, and let's get to Harry Smith, which is the ineffective assistance. But we believe that that decision flows from the sensationalism of the case. We're going to sensationalize everything. There's absolutely no reason Harry Smith should have been called in this case. He had all these witnesses coming in and saying that Stacey had told him this, and Stacey had told him that, and then he called. He's got nothing to lose at this point. It's almost, remember the Ryan trial when they called the janitor because the governor wouldn't cash any checks or spend anything, so he brings the janitor. I've got to explain this. Well, we gave cash to the governor, which was the nail in the coffin. And here, what did he have to lose? He was trying to use this guy to explain, well, it was obvious, they were trying to use these allegations to shake Drew down in a divorce proceeding. So there's only one person who testified in a trial that said they had ever talked to Stacey. One. Not all these people. One. Which was Pastor Short was the only one. And if you think about it, the reason that was offered at trial, the initial reason was, well, this is for extortion, to show she's an extortionist. In the state's brief, they quote the judge as saying, the judge was actually posing a question to the state at that point because that was the theory put forth by Mr. Brodsky. Then when the judge talked to Mr. Brodsky about it, Mr. Brodsky agreed that it's really not extortion when she talked to Short because how was Short going to help her extort anybody? Counsel, you have one minute. She's talking to Pastor Short and she's saying to him, I have this information, please don't tell anyone. There's no extortion, what was he going to do? But instead, what happened at the end, for no reason, because it didn't impeach Short at all, was called a witness and the witness said that Stacey called him up and said, will it help me if we say how Drew committed this murder? Will it help if I say Drew committed this murder? Those weren't even facts. If Stacey had been there, Stacey could not have walked into the courtroom, taken the oath, gotten on the stand, said, I know Drew did this, thank you, and left the courtroom. But that's what happened. That was the testimony. Effectively, Stacey came in the courtroom, said, I know Drew did this, I know how Drew did this, and left the courtroom because there were no details or anything. You know, an interesting concept here is you have a group of lawyers representing this defendant and the group doesn't always agree on trial strategy. So is it always an ineffective assistance to counsel if, at the end of the day, some trial strategy didn't work out the way it was planned, and so some were against it, some were for it, and because some were against it, that makes it ineffective? No, it makes it ineffective because it wasn't objectively reasonable under the law because no one would ever do that. That's why people disagreed because it was so, frankly, boneheaded to do. The jury, when they were deliberating, asked for that testimony. That's the testimony they asked for when they were deliberating was the Harry Smith testimony. The judge said, I think it's unusual that the state, in response to a motion for directive finding, says that the information of how he killed her came from the last witness called by the defendant. You have death penalty cases. Death penalty cases, there aren't many more in Illinois. You have two, three, four lawyers. No court has ever said that you can't argue ineffective assistance or find ineffective assistance in a death penalty case because the defendant had multiple lawyers. It's the decision. That was not my question. My question is, does it make it ineffective because some were for it, some were against it? I think it has nothing to do with it. I actually think it has nothing to do with it because you have to look at the decision that was made. Counsel's time. Thank you. Thank you, Mr. Kringer. Mr. Krent. Good morning. Good morning. In the midst of the sensationalized atmosphere of this trial, there was a series of evidentiary errors which undermined Mr. Peterson's right to a fair trial. I want to focus first on the over ten hearsay statements of both Kathleen and Stacey that were foundational to the prosecution's case and formed the basis to the case. And the hearsay statements directly implicated the defendant and Kathleen's death. They were admitted only by virtue of the forfeiture by wrongdoing doctrine. And the trial court fundamentally erred in finding that those sets of statements could be admitted under the forfeiture by wrongdoing doctrine. And that is because the court evidently agreed with the prosecution's theory that there was a motive for the defendant not to go through with the divorce trial. The motive was not to share his pension. The motive, they said, was perhaps to get sole custody of the kids. But they never showed any testimony that Kathleen could have given that would have altered the property settlement one way or the other. Indeed, we don't even know if she would have testified at the proceeding. So all we have is their idea of that maybe Mr. Peterson didn't want to share proceeds of his business, proceeds of his pension, or whatever. And that's what Giles, the U.S. Supreme Court decision Giles, demands of any kind of trial court to determine whether or not that there is proprietary evidence to show that the individual designed to make someone not testify. That was not done in this case. On that basis alone, the trial should be remanded. I'd like to quote a recent case in the name of Jensen out of Wisconsin. Federal courts said that the state's evidence of murder, as in this case, was not to prevent her from testifying at a divorce, but to eliminate the need for a divorce. The same thing is true in this case. No specific testimony to this day has ever been founded about hidden assets, clue grants, anything like that. Second, I want to turn to the Stacey's comments, also which were allowed in by the forfeiture by Warren doing doctor. It is clear that in a preliminary hearing that the court must exclude privileged information. And in order to determine forfeiture by wrongdoing, the court, Judge White, determined, studied, or let in, both evidence from Pastor Shorey as well as from Attorney Smith, as you've just heard. So I want to turn to Pastor Shorey, because but for that evidence coming in at the preliminary hearing, the forfeiture by wrongdoing finding would never have been made. The first thing that the court says is, well, Pastor Shorey, just so we're clear, are you arguing about their testimony at the preliminary hearing or trial? First, the preliminary hearing, because preliminary hearing leads to the forfeiture by wrongdoing hearing, which then leads to the testimony at trial. There's an appellate court decision, of course, on the earlier matters, isn't there? There's not specifically on the privileged matter. We didn't appeal, Your Honor, right? And there is no kind of cross-appeal on an inlocutory appeal. So this is the first time these issues are being aired. And, of course, the government has not complained of the fact that we are raising these issues on appeal either. But I mean, this is an appeal from the trial. Correct. But the forfeiture by wrongdoing was critical in terms of allowing this information to get into trial. Pastor Shorey was one of the statements that was allowed in a trial because of the forfeiture by wrongdoing determination. And in that case, there was an individual talking to a pastor, promised confidence, and all the requisites of privilege were satisfied. The court said, because it's in a coffee shop, you lose privilege. There is no court in history that has ever held that the place in which a confidence is given tells matters. We've already ruled on the forfeiture by wrongdoing, correct? You've ruled on the appeal by the state with respect to whether the common law or the statute applies, but you haven't ruled on the question of what the defense said was that the forfeiture by wrongdoing determination was incorrectly assessed by the trial court. And that led to the entry of all these statements by Kathleen and Stacey that were really the foundation of the prosecution's trial. And Pastor Shorey's confidence should have been respected. He promised confidence. He said that his religion promised confidences. And therefore, Stacey was expecting confidentiality. But under the forfeiture by wrongdoing, and I realize that none of these cases that I've looked at with forfeiture by wrongdoing ever deal with these privileges. And wouldn't it be counterintuitive in light of the broad type of evidence that you can bring in under the doctrine of forfeiture by wrongdoing, you prevented this witness from testifying, and then to allow you to say, well, gee, the witness isn't here, so I'm going to raise her privilege and keep this testimony from the pastor or the lawyer from coming in. Does that make any sense to you? Well, Rule 104 of the Illinois Rules of Evidence plainly states that any kind of preliminary evidentiary determination, questions of privilege, unlike any other question of evidence, questions of privileges are not to be considered or anything dealing with privilege. Now who has standing to raise that? Well, first of all, in terms of standing, I think it's clear that in terms of first the pastor, he was the pastor for defendant as well. They both were counseled about their marriage. They both were counseled about issues. So he was entitled to raise the privilege. He could assert the privilege to not allow Pastor Shorey to testify to any conversation he had. But what privilege, what right does he have to assert that privilege against Stacy? Well, privilege is a question. No one is ever supposed to deal with privilege information. So if anybody raises the privilege, whether it's the prosecution or the defense or anything else, you're entitled to raise it. But in this case, when the defendant himself was being counseled on the marriage and the group counseling endeavor, which was testified to, then that entire level of questioning and answers should have been excluded. That's just basic therapist privilege 101. And so he had the standing. And, indeed, in terms of Attorney Smith, there we know that the attorney applying privilege survives death. So if the attorney applying privilege survives death, then, of course, that suggests by its very nature that a third party can raise the privilege at that time. So I think it's very much self-evident. I don't have any relationship with Mrs. Savio at that time that would have allowed him to assert that privilege. I mean, they had a bifurcated hearing prior to her death. They were divorced. He was remarried. I don't see, you know, if her estate wanted to assert that privilege, I think they would be able to do so. How is this being enforced, the privilege, right? If someone, after someone dies, if an attorney then wanted to breach the confidence, who would be who to proceed to in order to assert privilege? The only way that the privilege can be sustained is if third parties have standing to assert the privilege. And, again, with the counseling with Pastor Shor. I agree with you. I just don't know that he is the third party that can assert that privilege. I think that there are certainly people that could assert that privilege on behalf of the decedent, the known decedent, Captain Savio. But I don't know what allows your client to raise that privilege. Well, with respect to the attorney issue, there I don't think there's any kind of procedural innovation which suggests before an attorney can testify, a notice has to go out to an estate. I mean, I've never seen that procedure done, which suggests that the logical person is the person who's affected. And the person who's affected, of course, was my client in this instance. But with Pastor Shor, Your Honor, it's even simpler. With Pastor Shor, the issue is he was one of the people that was being counseled by Pastor Shor about the very difficult, troubled marriage. So clearly he had standing with respect to Pastor Shor. And I don't think anyone has challenged it below. Finally, to our last evidentiary point, which again I think is pretty, very important, is the fact that there was bad ass evidence that was submitted at trial when no notice was given as required under the Illinois evidentiary rules, under Rule 404. And this incendiary information about a would-be hitman was first brought up, the first time, in an opening argument. The court clears it. The courtroom says, you can't do that. And then only later changes his mind and says, well, okay, I was wrong. You can do that. You can bring it in, even though there was no pretrial notice. And the good cause given by the judge was the fact that we were on notice. They may have been called. But the judge himself had said, don't, and admonished the jury not to listen to what was being said and had told the prosecution not to bring it up. So of course the defense were not anticipating that later on in the trial that this evidence would get in about the would-be hitman and indeed couldn't make their opening statement to prepare for the testimony, couldn't cross-examine other witnesses to prepare for this testimony. So there's a clear violation of Illinois rules of grave momentous import to the trial. And on that basis alone, again, the order should be overturned. Any questions, Your Honor? Thank you, Mr. Krantz. Thank you, Your Honor. Ms. Chet. May it please the Court. State's Attorney Blasco, Counsel for the Defense. Defendant raises every issue that he raises in his brief here in the oral argument this morning. I'll try and go through them in a fairly organized fashion. I'll begin with forfeiture by wrongdoing. As this Court has pointed out, this Court has already ruled on the admissibility of the forfeiture by wrongdoing statements. The State was entitled to bring those statements in. The law set forth in the United States since 1878 says if a defendant intentionally kills a witness so that witness cannot testify against him, he no longer has the right to confront that witness's statements. Those statements can come in. We have every right to present those statements. And when we look at those statements and we look at the evidence, that puts to rest any question of whether there's any doubt in this case about whether the defendant committed the murder of Kathleen Savio. We know that the divorce began in February 2002. In March 2002, she was prompted to put a deadbolt on her bedroom door, which was drilled out shortly after that. One and a half years before her murder, on July 5, 2002, the defendant committed a home invasion in which she broke in, held a knife to her throat, and threatened her life. Five months before the murder, October 2003, when speaking with Anderson, Kathleen Savio said she was so frightened she was sleeping with a knife under her mattress for protection. Four months before the murder, November 2003, the defendant told Kathy he could make her disappear and make it look like an accident. Four months before the murder, November 2003, another home invasion, another assault. He attacked her, he choked her, he left marks on her throat, and he said, why don't you just die? Four months before the murder, November 2003, a solicitation to commit murder. He says to Katherine, if you can find somebody for $25,000 to kill my ex-wife, to take care of my ex-wife, I'll pay the $25,000. If you can find somebody for less, you can keep the change. Six weeks before the murder, January 2004, he says, you won't make it to divorce settlement, you won't get my pension, you won't get the kids. Two weeks before the murder, he says, in court, in front of his colleagues, he says, my life would be easier if she were just dead. And two days before the murder, Kathleen begs her sister to take care of her boys. On the night that Kathleen died, the defendant left home, after he had gone to bed with Stacy, he left home later without telling Stacy. He's trying to find Stacy, he cannot, or she cannot. He returns, still in the middle of the night, she goes down, he's dressed all in dark clothes, he takes his clothes off, puts them in the washing machine, takes her clothes, they're clothes in a duffel bag, women's clothing, it was not Stacy's clothing. He takes that clothing, he puts it in the washing machine, he washes everything. He tells Stacy, the police will want to interview you about where I have been tonight. And then he spends hours coaching her. And then she said, I lied to the police. There's no question here that the defendant committed these crimes. No question whatsoever. Circumstantial evidence is more than sufficient. In terms of the conflict, it's important to remember that the defendant initiated the publicity attention. He's the one that brought the media attention to himself. He went on television to try and find a lawyer. Even before that, he had already talked to Geraldo about bringing his story forward. He said that he thought his silence was getting him in trouble. He wanted to put his story out in front of the public. Which may in fact have been very regrettable on his part, but he's not a lawyer. When you hire someone and the rules say if you have a financial interest in this, we know it's a per se conflict, we allow for a waiver, but I don't see that there is any actual waiver of the per se conflict of a conflict of interest. Is this something you can point to? Yes. I think the distinction here is that what Gacy says is that an adverse financial interest is a per se conflict, but a media contract is not a per se adverse financial interest. We have to look at the media contract. We have to look at those facts to see if that establishes a conflict. In this case, it does not. The defendant entered into the contract as well as Mr. Brodsky. There was not some story behind the story that the defendant didn't know about. The defendant knew all about that. As in United States v. Marrera, where the defendant is part of the contract, he knows about the contract. He doesn't bring it to the court's attention. It's not a per se conflict. In fact, in Marrera, they said it was no conflict at all. In this case, the media attention had absolutely no impact on the trial. And I will also point out that there was no evidence whatsoever that at the time of the trial, Mr. Brodsky had an ongoing interest in the media contract. The media contract with Selig had expired before the defendant was even indicted. There was a second agreement with Flea. I'm sorry, I've forgotten the name of it, but Screening Flea Productions. But that also had expired. They continued on, but that also expired before the trial began. Mr. Brodsky testified that he had no ongoing relationship with Selig or with any media contract at the time of the trial. So the only other person that could have been called to shed light on that would have been Mr. Selig, and he was not called. What about the Spreitzer case? It says, Defense counsel's ties to a person or entity which would benefit from an unfavorable verdict for the defendant might subliminally affect counsel's performance in ways difficult to detect or demonstrate. Moreover, such a conflict might subject the attorney to later charges whose representation was less than faithful. Even if you know going in that there's this contract, that as it progresses that it may lead to something that is difficult to explain, difficult for the client to understand the significance of, and that's why there's a feeling that they shouldn't have to demonstrate There is no showing here that there is a tie to someone who has a financial interest in losing this case. There is absolutely no benefit to Mr. Brodsky in losing this case. Winning this case brings new clients, brings fame, brings prestige. Losing this case, as we have seen in Mr. Brodsky's case, brings ignominy. It brings loss of clients. It brings loss of income. He had no motive, no conceivable motive to want to lose this case. Everything said that he should go forward with full guns blaring to try and win this case. Everything he did at the trial was designed to try and win this case. I would also point out that there were six attorneys here. In the other five attorneys, there's no allegation that there was any conflict whatsoever. If they saw a problem, if they saw something that was in Mr. Brodsky's representation that they thought was a problem, they would have come forward. And we know that because at the record on page 10,305 to 10,308, Mr. Greenberg staged a quote-unquote mutiny. It was a decision that Mr. Brodsky was pursuing that Mr. Greenberg disagreed with. Mr. Greenberg came forward, stopped him in the questioning, had a conference. The court had even pointed out, what was happening was, it was during the defense case, they had recalled one of the state's witnesses, Sergeant Fellett, and they were talking about Stacy's interview with the defendant. Mr. Brodsky was going to go in and show, I think what his friend showed was an inconsistency in that interview. And the judge even stopped and said, you know, you realize that this might, going down this road might influence my ruling on other privileges, the merit of privilege. And Mr. Greenberg came forward and said, you know, you're about to see a mutiny. When he disagreed with something Mr. Brodsky wanted to do, he came forward. When they called Harry Smith, the state objected. The defense stood silent. No one said a word. No one objected. Those other five lawyers, if there had been something that they saw in Mr. Brodsky's representation that was conflicted, they would have come forward. They would have said something to protect their client, and they did not. I think there is no question that there is no adverse financial interest shown in this case. I think there is no question that the media contract may have been a rules violation, and that's fine. That's for the ARDC to determine whether Mr. Brodsky should be sanctioned for that. But it had no impact on this trial. It is certainly not a per se conflict, and they can't possibly show prejudice. The closest they come to showing prejudice is the calling of Harry Smith. And so let's talk about that. Was that ineffective assistance of counsel? You have six lawyers. One lawyer says, call Harry Smith. They sat down in a conference room, the defendant and four of the six lawyers. One lawyer says, call Harry Smith. I think we need him. We need him to impeach Stacy. Her testimony came in through Pastor Shorey. Pastor Shorey was very credible. We've got to do something. She's painted as this terrified young mother, paralyzed with fear, afraid to go forward and bring her story to light. So they need to impeach Stacy because they've got other evidence through Mr. Smith that shows, well, you know, she's not always quite so timid. You know, sometimes she's quite brazen. Sometimes she almost even looks like a distortionist. So they sit down in a room, and Mr. Brodsky says, okay, then we should call Harry Smith. And the other three lawyers say, oh, no, do not do that. That's a big mistake. Don't do it. At the end of the day, who makes the call? Sergeant Drew Peterson, a police officer with 25 years' experience, the watch commander of the Bolingbroke Police Department. He made the call. This is not Mr. Brodsky's mistake. This is the defendant's mistake. He's confronted with conflicting advice from his attorneys. Somebody's got to make the decision, and it was the defendant who made the decision. The uproar about Mr. Brodsky is all a misnomer. It was the defendant's decision. He made the call. I would also point out that Mr. Smith's testimony was not all that prejudicial to the defendant. It was not prejudicial at all. The testimony from Mr. Smith was that Stacey thought that the defendant killed Kathleen. And Pastor Shorey had already testified to that. It was already in front of the jury. The state had brought its case full circle long before Mr. Smith ever took the stand. So there was no prejudice from that call. As far as the attorney-client privilege is concerned, the defendant called Mr. Smith at trial. At trial, there is certainly no privilege. There is no possible room for him to claim that there was an attorney-client privilege when he brought the witness to the court. I would point out that the people objected to Mr. Smith testifying, but the defendant did not. And the defendant never once said the word privilege. The defendant called Mr. Smith. At the hearing, Stacey waived any privilege. I agree with Judge White's ruling that the defendant had no standing. As you pointed out, Justice O'Brien, the defendant was essentially on trial at that point for whether or not he murdered Stacey. He did not have the right to bring the privilege. The privilege is designed to protect the client. And here we have the client's purported murder trying to hide behind her privilege. Instead of protecting her, he wanted that privilege to protect him, the person who was being tried or being at least by preponderance of the evidence, for her murder. I see no reason that the privilege could possibly have applied. Furthermore, Stacey waived the privilege. Stacey didn't keep that communication to Mr. Smith, Sacrosanct. She told the same thing to Pastor Shorey and the same thing to Scott Rosetto. So the same evidence had come out other places. In his reply brief, the defense says that the state cites no authority for the fact that there can be a waiver of the privilege. In fact, we did cite authority. It's Justice Scarman speaking for the unanimous Illinois Supreme Court, Center Partners Limited versus Growth Head GP, 2012, ill 113107, paragraph 35. Counsel, that's two minutes. Thank you. As far as the clergy privilege is concerned, Pastor Shorey testified that he went to Starbucks to talk to Stacey. He did not go to a private place. He went to a public place. He even brought a third person along with him so that that person could witness, not close enough to hear, but could witness their interaction. Why was this? Because the defendant, as we saw from the testimony at the hearing, was wildly jealous, was constantly following Stacey, constantly accusing her of inappropriate behavior. He brought a witness so that there would be, he was a young, attractive man counseling a young, attractive woman. He did it in public with a witness so that there could be absolutely no question about it. If this were a confession situation, it would have been done in private. Furthermore, Stacey did not confess. Stacey was not a penitent. She did not suggest some moral culpability on her part. She said, I'm afraid. My husband is a murderer. I'm afraid. That's what she said during the conversation. This was not a penitent situation. So he did not invoke the privilege because there was no reason to invoke the privilege. Rather, when he heard that she was missing, he followed his conscience, came forward, and said, I have information that could shed some light on what happened to her. He did not invoke the privilege. So it was controlled by the case People v. Dirks, where the Baptist minister also came forward with the information. There was no privilege here. As far as the other crimes evidence is concerned, and Mr. Pachter's testimony, the defendant had full notice that Mr. Pachter was a potential witness. I realize that people made a mistake and did not put him on their list of witnesses. But Mr. Pachter testified at the hearing in 2010. And we know that the defense at least anticipated something on Mr. Pachter because during the opening argument, when the first mention of the $25,000 came out, the defense objected before the state could even finish that sentence. The defense jumped up, objected, claimed it only needed a mistrial about the whole thing. They knew about that testimony. They knew it was potentially coming in. They knew that the state had possibly made a mistake. They knew. If I could just finish this point. Thank you. And so the people filed their motion to admit Mr. Pachter's testimony on August 2. On August 14, the defendant responded. On August 17, the court granted the motion. And on August 22, Mr. Pachter testified. The point is the defense had plenty of notice that Mr. Pachter's testimony was coming in. It was not five days. It was more than that. They're certainly on notice from August 2, constructive notice from August 2, and from the time the court started ruling on August 17, they had absolute actual notice. And so in conclusion, it's our position that for these reasons and all the reasons set forth in our brief, we're asking this court to affirm the defense conviction and sentence for the first-degree homicide of Kathleen Hamas. All right. Kathleen, we'll stop there. Thank you, Mr. Chairman. Thank you. Mr. Greenberg for rebuttal. Thank you. I'm going to try and sort of fly through this, but I'm a little bit befuddled by the last thing that says, well, we were obviously on constructive notice because we objected. We objected because there was no notice to Pachter coming in. That's why we objected. If we hadn't objected, then they would have said you knew it was coming in. So I'm a little bit confused by that one, but I want to get to the other points. Your Honors talk about, well, the state says that the Harry Smith testimony was cumulative, and they keep bringing up someone named Scott Rosetto and saying, Stacy, talk to Scott Rosetto. Scott Rosetto did not testify at the trial. He got three questions into it, and then the judge barred his testimony on due process grounds. So he didn't testify. The only statement from Stacy about Drew doing anything was the statement to Shorey with absolutely no ability, no ability at all to extort anybody, and that statement was factually incorrect because it said that Drew came home the night before Kathleen's body was found with clothes, washed them, and, you know, washed the lady's clothes, washed his own clothes, dressed all in black, and then he told me to lie when the police came. Well, first of all, the death was two days before her body was found, so it couldn't have been the night before her body was found, and it's just nonsensical. Why would you bring someone's clothes home if you killed them, wash them, and do all this stuff? Why wouldn't you have gotten rid of them? That statement was challenged when it was in court, but then came the Smith situation.  The state had respected that ruling. In fact, the state objected when Smith was going to testify. We didn't have to get up and object. They were making their arguments for us. Well, why would you object when you were calling them? Well, you know, you're a co-counsel. You're on a team. You can't just get up there and, you know, I'm going to lay across the witness box and not let this witness sit there, but they made those arguments, and the privilege, the judge had found the privilege of what?  Well, let's talk about that a minute. Okay. Is the attorney-client privilege, do you think it is designed to protect the client or people that kill the client? I think it's designed to protect the client. Okay. And so how does letting somebody, how does letting this person that murdered the client raise that privilege protect the client? I think it's to protect the confidences. Maybe the client didn't want them to know, and you can't... Well, my guess is if I'm dead, I'm not going to object to my lawyer testifying against the guy that killed me. What do you think? But in order to make that initial determination, that's the problem with this. They broke the privilege to make the initial determination that this was more likely than not the guy who killed him. So you're breaching the privilege to reach the result that you want to reach. In other words, the state shouldn't have called him because they knew the privilege existed. The judge shouldn't have let him testify at the first hearing because he knew the privilege existed. If we go with the rationale that your honor just said, then we've got an ends justifies the means. And we can't do that because then what are we going to say next? Well, they found a kilo of cocaine in the car, so it's okay that they illegally pulled it over. We can't go there. The privilege is very important, and the court is the duty to enforce the privilege. And that applies to everyone. The court is enforcing the privilege for the person. Mr. Peterson is not trying to enforce Stacy's privilege. It was brought up. It was brought up in court, and the court said, and we studied federal case law, it says that you have a duty and an obligation to do that. And then Smith was called, and Smith was called. Did any of those cases involve where there's a forfeiture by wrongdoing? No, they didn't, but that doesn't... The type of proceeding it is, other than being appropriate proceeding, should govern whether or not the privilege applies, because, again, then we're in the ends justifies the means. We're going to put the privilege aside because we like the result, or this is the result we want. And who's to say... Forfeiture by wrongdoing. Right. You forfeit something because of wrongdoing. But you don't forfeit having a fair hearing. You don't forfeit that. Have a fair hearing, and then if they find it, that's fine. Then you forfeit what you're forfeiting is the missing witness coming in. What was unfair to your client about Smith testifying? Because Smith's testimony at the forfeiture hearing you're talking about, initially? At any hearing. How is that rendered unfair that Stacy Peterson's lawyer testified? Sure. Because at the forfeiture hearing, he testified, he provided the reasons why Stacy was missing. She was telling me these things. She was going to tell people that he had killed Kathleen. She was going to say all these things. He was the one who made her a witness. It was based on his testimony that it was determined that she was a witness. And at the trial, again, what he said was, she told me Drew killed her. That's what she told me. Drew killed Kathleen. Not Drew dressed up in black. Not Drew went over the house in the middle of the night. Not Drew dropped her in the bathtub. Not Drew beat her over the head. Not he cleaned up the scene. Not any of that. Drew killed Kathleen. Not even Drew said he killed Kathleen. It was totally inadmissible evidence. Forfeiture by wrongdoing, as I think I said before, the person is supposed to come in and testify. You're basically them. So if I eliminate a witness, and then someone comes in, and they're effectively that witness on the stand. So Harry Smith was effectively Stacy on the stand. That's how forfeiture works. And you're waiving the confrontation clause. You've lost the confrontation right to the actual person, the hearsay. So now, Harry is Stacy. If you look at the examination of what was said, none of that would have been said. And if we had called Stacy to say that she knew Drew killed Kathleen, what would be the purpose of that? I mean, I would have thought, why would you call a witness to say that they knew that your client was guilty? Can I just address one more? Because you asked about the conflict and the per se conflict and the rule, and I just wanted to say, there was other evidence in the record of trying to sell things. There was evidence in an earlier hearing of trying to sell for $200,000 some pictures and so forth. And it's not that we're saying that it gives you a motive to lose the case. It gives you a motive to make decisions that will sensationalize the case, that will bring grandeur to the case, that will put you in the spotlight. And, you know, that's the problem with it. And that's why it's a per se conflict. Any questions? Thank you very much, Mr. Greenberg. Thank you all for your arguments here today. This matter will be taken under advisement and a written decision will be issued to you as soon as possible.